S94A1009. NORTH GEORGIA ELECTRIC MEMBERSHIP
CORPORATION v. CITY OF CALHOUN.
(450 SE2d 410)

HUNSTEIN, Justice.

This is the second appearance of these parties before this Court. *City of Calhoun v. North Ga. EMC*, 264 Ga. 205 (443 SE2d 469) (1994) held that the City of Calhoun ("City") could not collect a franchise fee of four percent of gross sales by North Georgia Electric Membership Corporation ("NGEMC") to its customers within the city limits pursuant to an ordinance (Ordinance No. 361) authorizing the grant of a street franchise to NGEMC in exchange for its agreement to pay the franchise fee because there existed no enforceable contract between the City and NGEMC. In response to NGEMC's rejection of Ordinance No. 361 and its refusal to pay the franchise fee, and pending the litigation resulting in *City of Calhoun*, id., the City adopted another ordinance, Ordinance No. 493. This ordinance imposed a four percent gross receipts tax on the revenues of

"each secondary supplier (including specifically Electric Membership Corporations whether or not operated for profit), within the meaning of OCGA § 46-3-1 *et seq.*, distributing and selling electric power within the City which is not otherwise paying a franchise fee pursuant to a franchise agreement. . . ."

NGEMC refused the City's demand to pay the business tax and filed the present action seeking declaratory and injunctive relief. The Gordon County Superior Court entered summary judgment in favor of the City, declared the ordinance valid and ordered NGEMC to remit the accrued tax payments to the City. NGEMC now appeals from that order contending that as a franchise of the Tennessee Valley Au-

thority ("TVA") it is exempt from the payment of the business tax and that the ordinance is unconstitutional. We disagree as to both contentions.

1. NGEMC asserts that it is a "franchise" of the TVA and is thus exempt from the Ordinance No. 493 tax by virtue of Section 13 (also known and referred to herein as "§ 831 (l)") of the Tennessee Valley Authority Act (hereinafter "the Act" or the "TVA Act"). The trial court erred, NGEMC contends, when it misconstrued the term "franchise" and therefore concluded that NGEMC's contract with the TVA is not a franchise for the purposes of § 831 (l).

The proper construction of the word "franchise," as it appears in § 831 (l), is a question of first impression in this state, but has been addressed several times by the federal courts of the northern district of Alabama[1] and, most recently, by the state court of Alabama in *City of Centre, Alabama v. Cherokee Electric Cooperative*, Civil Action CV-92-009 (Cherokee, Ala. Cir. Ct. July 23, 1993). In its analysis of the issues presented, the trial court adopted the framework established by the Sixth Circuit in its interpretation of Section 13 of the TVA Act in *City of Tullahoma v. Coffee County*, 328 F2d 683 (6th Cir. 1964). This process involved examination of the statute itself, the legislative history, the administrative interpretation and the history of Congressional acquiescence in that interpretation. Because we are persuaded by both the logic of the process and the conclusion reached by the trial court we will briefly review each facet of that process.

(a) By plain language, the Act created a "body corporate by the name of the 'Tennessee Valley Authority' (hereinafter referred to as the 'Corporation')." 16 USC § 831. Among its stated purposes are agricultural and industrial development and control of floods in the Tennessee River and Mississippi River Basins. An integral part of the development role is the generation of electricity and the sale of surplus power through both public and private distributors. In order to compensate states in which the TVA had acquired private utilities which had theretofore generated substantial tax revenues to state and local jurisdictions, the Act provided for payments in lieu of these lost taxes to the impacted jurisdictions. In 1940 § 831 (l) was amended to accomplish several objectives.[2] That language, as currently codified, and upon which NGEMC relies is as follows:

The payments herein authorized are in lieu of taxation, and

---

[1] See *City of Sheffield v. Town of Cherokee*, No. 89-AR-5073-NW (N.D. Ala. Oct. 12, 1989); *Town of Courtland v. Town of North Courtland*, No. 90-L-1346-NE (N.D. Ala. 1990); *Cullman Electric Cooperative v. City of Cullman*, No. 91-N-665-NE (N.D. Ala. Aug. 30, 1991). See also *City of Arab v. Arab Electric Cooperative*, No. 92-N-0379-M (N.D. Ala. 1992) (case dismissed on basis of lack of federal jurisdiction).

[2] June 26, 1940, c. 432, § 39, 54 Stat. 626.

the Corporation, its property, franchises and income, are expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision or district thereof.

16 USC § 831 (l). NGEMC contends that it is a franchise of the TVA and thus exempt, but neither the language of the statute, nor its legislative history supports that contention.

From the earliest history of this country, the term "franchise" has signified a government charter or special privilege conferred on an individual or corporation to do something which it otherwise had no common right to do. *Bank of Augusta v. Earle,* 38 U. S. 519 (10 LE 274) (1839); *McCullough v. Maryland,* 17 U. S. (4 Wheat.) 316 (4 LE 579) (1819). Indeed, NGEMC possesses a franchise granted by the State of Georgia by virtue of OCGA § 46-3-170 et seq. TVA's charter and its powers thereunder are "franchises" of the TVA, but while the Act specifically authorizes the TVA to enter into contracts with states, counties, municipalities, corporations, partnerships or individuals for the sale of its surplus electric power (16 USC § 831 (i)), the Act does not authorize TVA to grant franchises nor does the word "franchise" appear elsewhere in the Act in any context. Moreover, supply contracts between utilities were not regarded as creating franchises at the time the amending language was adopted. See *Griffin v. Oklahoma Natural Gas Corp.,* 37 F2d 545 (10th Cir. 1930).

(b) As noted by the trial court, the legislative history of § 831 (l) leads to the conclusion that cooperatives, such as NGEMC, were never intended by Congress to be exempted from state and local taxation. In hearings before congressional committees, it was repeatedly stated that the purpose of the language upon which NGEMC relies was to emphasize that TVA (i.e., federally owned) property would remain exempt from state and local taxation, notwithstanding the "in-lieu" payments, while properties not acquired by the TVA, but owned by rural electric cooperatives would remain subject to state and local taxation.[3]

(c) Following the *Tullahoma,* supra, framework, the trial court next considered the construction accorded the statute by those charged with its administration as a key factor in arriving at its meaning. Relying on the 1944 TVA report to Congress on the amended Section 13,[4] as well as other administrative reports and

---

[3] See To Amend the Tennessee Valley Authority Act of 1933: Hearings on H.R. 7424 Before the House Committee on Military Affairs, 76th Cong., 3d Sess. 210 (1940); To Amend Tennessee Valley Authority Act of 1933: Hearings on S. 2925 Before the Subcomm. of the Senate Comm. on Agriculture and Forestry, 76th Cong., 3d Sess. 8 (1940).

[4] *Report on Section 13 of the TVA Act,* December 22, 1944. The report stated, inter alia, that while the electric cooperatives were regarded as a part of the TVA regional power sys-

communications, the trial court found that the TVA has consistently taken a position that the taxation of cooperatives is a matter of State and local law. This conclusion was reinforced by reference to the contracts between the TVA and NGEMC. As set forth in the order of the trial court, Section 5 of the 1936 contract between TVA and the promoters of NGEMC required that the

> Promoters [cooperatives] agree to procure . . . all the franchises and consents from the governing bodies of counties and the governing bodies of incorporated towns which may be necessary for the construction and operation . . . of the rural lines herein provided for.

Section 6 of the current contract between TVA and NGEMC is an agreement by NGEMC to use its gross revenues for several enumerated purposes, including the payment of taxes, thus controverting NGEMC's claim that § 831 (l) affords it a blanket exemption as a franchise of the TVA.

If Congress has taken issue with the TVA's interpretation of § 831 (l), it has not chosen to override that position by amendment to clarify its intent.

2. NGEMC also argues that the trial court's erroneous conclusion that its contractual relationship with the TVA does not render NGEMC a tax-exempt franchise of the TVA ignores the integral role of NGEMC in the performance by TVA of its congressionally mandated functions. NGEMC's role as a so-called "preference distributor"[5] renders it, according to NGEMC, an instrumentality of the TVA and therefore of the United States government. As such, it contends, NGEMC is shielded from taxation by state and local authorities by the provisions of the Supremacy Clause of the United States Constitution.[6] In support of its argument, NGEMC refers this Court to examples of the contractual control exerted by the TVA over NGEMC as a preference distributor. While we acknowledge that NGEMC's control over key elements of its own operations is heavily circumscribed by various provisions of its contract with the TVA and that electric cooperatives have been held to be instrumentalities of the

---

tem, the cooperatives are subject to State and local taxation unless specifically exempted. *Report* at 24.

[5] 16 USC § 831 (i) provides in part that the TVA is authorized to sell surplus power to States, counties, corporations, etc., to enter into contracts therefor and is directed to give preference in the sale of its surplus power to States, counties, municipalities and "cooperative organizations . . . not organized or doing business for profit . . . ."

[6] U. S. Const., Art. VI, Cl. 2; *McCulloch v. Maryland*, 17 U. S. 316, supra (absent Congressional consent, the Federal government and its instrumentalities are immune from State taxation under the Supremacy Clause).

United States for purposes of exemption from the anti-trust laws,[7] this Court is not persuaded that NGEMC's right and privilege to distribute electric power purchased by it from the TVA pursuant to that contract renders NGEMC an instrumentality of the federal government exempted from State and local taxation.[8]

3. Irrespective of the determination of its franchise status, NGEMC argues that Ordinance No. 493 violates the uniformity requirements of Art. VII, Sec. I, Par. III of the Georgia Constitution of 1983 because it creates an arbitrary and therefore unreasonable classification upon which it imposes a gross receipts tax, i.e., "[e]ach secondary supplier . . . distributing and selling electric power within the City *which is not otherwise paying a franchise fee pursuant to a franchise agreement.*" (Emphasis supplied.) Ordinance No. 493. In considering NGEMC's contention we note preliminarily that it must carry the burden of showing that the tax creates unreasonable classifications. *Nat. Linen Svc. Corp. v. Gainesville*, 181 Ga. 397 (182 SE 610) (1935). It is without question that the City has the authority, by virtue of its charter, to levy the kind of tax here contested and that the classification of businesses for the purpose of imposing such taxes is largely within the discretion of the taxing authorities, subject only to the requirement that the classification be based on some reasonable ground. *Lake Lanier Theatres v. Hall County*, 229 Ga. 54 (189 SE2d 439) (1972). Moreover, the power to classify includes the power to subclassify. *Wright v. Hirsch*, 155 Ga. 229 (116 SE 795) (1922). We agree with the trial court in its determination that Ordinance Nos. 361 and 493 not only may, but should be read together. Having done so, we further agree that in the instant case the City has established a class: secondary suppliers of electricity operating within the City, and two subclasses: those who have entered into franchise agreements (pursuant to Ordinance No. 361) and those who have not (and must remit a gross receipts tax, in the same amount of four percent, pursuant to Ordinance No. 493). A classification based upon the payment of another tax or franchise fee does not render the classification unreasonable. *State of Ga. v. Southern Express Co.*, 133 Ga. 113 (65 SE 282) (1909). Neither does the fact that both classes are currently comprised of one entity invalidate the instant classifications. *Wright v. City of Atlanta*, 50 Ga. App. 244 (177 SE 753) (1934). It is only neces-

---

[7] *Alabama Power Co. v. Alabama Electric Cooperative*, 394 F2d 672 (5th Cir. 1968), cert. denied, 393 U. S. 1000 (89 SC 488, 21 LE2d 465) (1968).

[8] See *North Ga. EMC v. City of Calhoun*, 820 FSupp. 1403 (N.D. Ga. 1992); aff'd on other grounds *North Ga. EMC v. City of Calhoun*, 989 F2d 429 (11th Cir. 1993). NGEMC's federal declaratory judgment action was held barred by the Tax Injunction Act (28 USC § 1341); the court stated that it did not regard NGEMC's contract with TVA as rendering NGEMC an instrumentality of the federal government for purposes of the Tax Injunction Act.

sary that the subclass be based on "some difference which bears a just and proper relation to the attempted classification." *Lake Lanier*, supra at 55. The creation, by Ordinance No. 493, of a subclass of secondary suppliers not paying a franchise fee under Ordinance No. 361 cannot be said to be an unreasonable classification when viewed with reference to that subclass of secondary suppliers created by Ordinance No. 361. Accordingly, we hold that Ordinance No. 493 does not violate the uniformity clause of the Georgia Constitution.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 28, 1994 —
RECONSIDERATION DENIED DECEMBER 20, 1994.

*James C. Brim, Jr., Robert C. Richardson, Jr., Kinney, Kemp, Pickell, Sponcler & Joiner, L. Hugh Kemp, Wagner, Myers & Sanger, Herbert S. Sanger, Jr.,* for appellant.

*Alston & Bird, L. Clifford Adams, Jr.,* for appellee.